# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **CAROLINE DULFER,** § | | **CIVIL ACTION** |
| Plaintiff § | | |
| § | | |
| VS. § | | **NO. A-11-CA-911** |
| § | | |
| **SETON HEALTHCARE, INC.,** § | | |
| Defendant § | | **JURY REQUESTED** |

## ORIGINAL COMPLAINT

### Jurisdiction and Venue

1. This action alleging violations of the TEXAS OCCUPATION CODE §§ 301.001 et seq. and/or TEXAS HEALTH & SAFETY CODE §§ 161.131 et seq. is brought against Defendant Seton Healthcare, Inc. ("Seton").

2. No conditions precedent are required prior to the filing of this original complaint.

3. This action is timely filed given that it has been filed within 180 days from the date that Dulfer was placed on unpaid suspension on April 26, 2011.

4. Jurisdiction of this Court is invoked under 28 U.S.C. § 1332.

5. The acts or omissions, which serve as the basis for this cause of action, occurred in Burnet County, State of Texas and in this Division of the Western District of Texas; therefore venue is proper in this Court. 28 U.S.C. §1391(b) and (c). Additionally, Seton conducts business in Austin, Travis County, Texas.

### Parties

6. Plaintiff, Dulfer, is a licensed registered nurse whose is currently living and working as a nurse in Tennessee and plans to remain in Tennessee. Dulfer may be served through her attorney of record in this case.

7.  Defendant, Seton is a domestic nonprofit corporation with its headquarters in Travis County and may be served process through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, TX  78701-3218.

## STATEMENT OF THE CASE

8.  This suit claiming retaliatory actions against Dulfer by Seton is brought pursuant to the TEXAS OCCUPATION CODE §§ 301.001 et seq. and/or TEXAS HEALTH & SAFETY CODE §§ 161.131 et seq.

9.  Dulfer made reports of patient care issues that were being negatively impacted as a result of misconduct by various Seton employees.

10.  Seton acknowledged its awareness of the type of misconduct referred to by Dulfer, however, Seton did not take appropriate action in response to Dulfer's reports and the misconduct continued.

11.  In response to the continued misconduct negatively impacting patient care, Dulfer made a second report to Seton management and HR of additional patient care issues just over two months after the first report.

12.  Less than a week after the second report, Dulfer was placed on unpaid suspension pending an investigation into accusations against Dulfer involving four incidents that allegedly occurred prior to her second complaint but about which Seton had never raised with Dulfer prior to her second complaint.  These four allegations against Dulfer are fabricated, contrived, or patently misrepresent the facts and in any case do not establish that Dulfer had violated the terms of her license or her job duties.

13.  Dulfer complained again to Seton HR: this time regarding the lack of response to her report of patient care issues and also the retaliatory actions being taken against her.

14. Less than a week later, Seton representatives made a complaint to the Texas Board of Nursing against Dulfer, based upon false or contrived allegations.

15. Seton has taken additional retaliatory actions against Dulfer that have negatively impacted her reputation, self-esteem, ability to obtain replacement employment, other economic benefits, and emotional condition.

## FACTUAL ALLEGATIONS

16. Dulfer has worked as a licensed registered nurse for over 23 years.

17. Dulfer began employment with Seton on November 15, 2010 with orientation in Austin and subsequently in the emergency department ("ED") in Seton's Highland Lakes facility.

18. Prior to beginning employment with Seton, during her interview for the position with Mary Humphrey, the ED Director, Ms. Humphrey informed Dulfer that Humphrey did not tolerate bullying. Humphrey did not elaborate on or explain her reasoning regarding this comment at that time.

19. After beginning employment Dulfer began to experience harassment and bullying from some of the staff within the ED (nurses and other staff). At first Dulfer did not consider the harassment to be of consequence. However, by February 2011, Dulfer considered the bullying and harassment to have crossed the line from merely harassing the new employee to negatively impacting patient care in the ED.

20. In response to a request from Dulfer, Humphrey and Dr. Robert Harding conducted a telephone meeting with Dulfer where Dulfer reported the hostility from some of the staff in the ED and the effect and potential effect of that hostility on patient care.

21. Dulfer specifically reported the following two incidents as examples of what was occurring in the ED:

- The main incident conveyed was what prompted Dulfer to request the meeting with Humphrey and Dr. Harding.  Dulfer recounted an incident that she represented to Humphrey and Dr. Harding could have resulted in the loss of a patient's life.  While in a room with a patient and Dr. Harding, at Dr. Harding's request (and as acknowledged by Dr. Harding during this telephone meeting), another patient with chest pains was placed in one of the rooms assigned to Dulfer without any notice being given to Dulfer of the placement of this patient in her room.  When Dulfer emerged from the consultation with Dr. Harding approximately 35 minutes later, she checked her rooms and found this patient in his street clothes without any procedures or meds having been administered.  This was in obvious violation of standard protocols in the ED and given the failure to follow any of the protocols could have easily resulted in this man's death.
- Dulfer also informed Humphrey and Dr. Harding of her being assaulted by Patricia Savoy when Dulfer was assisting as a member of the ED team to help open the airway of a patient that had seized.  Savoy physically and aggressively pushed Dulfer away from the patient while Dulfer was attempting to lift the patient to help open the airway prior to Savoy suctioning the airway.  This moved Dulfer back at least four feet and nearly knocked her down.

22. During the meeting, Humphrey acknowledged that she had had problems with hostility in the ED between the nurses in the past.

23. At the conclusion of the telephone meeting Humphrey and Dr. Harding both thanked Dulfer for coming forward with her report and assured Dulfer that they would be following up on her report of patient care issues.

24. Dulfer has yet to hear from Humphrey, Dr. Harding, or any Seton representative of any action taken in response to her report of patient care issues.

25. Dulfer is unaware of any investigations, disciplinary actions, or reports to the Texas Board of Nursing that were made to address the misconduct that she reported to Humphrey and Dr. Harding.

26. Although Dulfer acknowledges that the hostility against her appeared to subside after that February 9, 2011 telephone meeting, it did not go away and in fact began to reemerge from mid-March through mid-April 2011.

27. On April 18, 2011 Dulfer came to work with conjunctivitis in her left eye (oozing and painful). Dr. Stokes wrote Dulfer a prescription and sent her home. On the way out Ms. Dulfer noticed Clifton Grant, an ED tech and one of the individuals who had been engaged in the harassment of Dulfer in the months prior, using the computer that is next to the psych room and adjacent to the phone that Dulfer shared with another nurse and had used for the entire five months that she had worked there.

28. The location of that computer is critical to the performance of Dulfer's responsibilities and the care of patients assigned to her due to the organization and assignments of duties in the Highland Lakes ED, while the ED tech who was using the computer does not have any such comparable reason to use that particular computer and therefore he should be free to locate and use a different computer. Dulfer mentioned to Grant that since she was headed home that there was no issue with him using that computer for that shift but that he would need to find a different computer to use in the future.

29. Grant responded that Dulfer would have to use another computer.

30. Given the patient care issues implicated by Grant refusing to allow Dulfer to use this computer proximate to the psych room and other rooms, Dulfer wrote a complaint email on April 22, 2011 at 11:41 am to Humphrey reporting this issue and others regarding Grant's performance as an ED Tech as well as reporting the continuing hostility in the ED that she had reported to Humphrey back on February 9, 2011 and Grant's role in that continued hostility and the impact on patient care.

31. Neither Humphrey nor any other Seton representative ever responded to this report from Dulfer, either in person, by email, or any other method.

32. Instead, Humphrey sent an email later that day at 1:00 pm to Dulfer requesting a meeting about "occurrences that [Humphrey] had gathered to discuss with [Dulfer] prior to [Dulfer's] last illness." Humphrey did not specify a time or any urgency related to this meeting or indicate that there was any concern related to patient care or safety associated with these "occurrences." The meeting occurred four days later on April 26, 2011 at 11:00am.

33. On April 24, 2011, Dulfer observed another ED tech using the same computer that she had complained to Humphrey that Grant was using and that would impact her ability to provide reasonable care to the patients assigned to her. As a result of the lack of response from any Seton representative regarding her report of patient care issues impacted by ED techs using that computer instead of nurses assigned to patients in the rooms proximate to that computer, Dulfer understood that she would not be able to assume the duties to care for the patients proximate to that computer without being able to use that computer and therefore requested of the charge nurse on the ED at that time, Vickie Spaw, that she be allowed to work triage for that shift because Dulfer was concerned about that lack of appropriate care to her patients that would result if she was not allowed to use that computer in proximity to those assigned patients.

34. Spaw agreed to allow Dulfer to work triage on that shift.

35. The next day, having still not received any communication regarding her complaints of patient care issues, Dulfer contacted Seton HR to ensure that Seton would address these patient care issues if the ED supervisors would not.

36. Dulfer is unaware of any action being taken by Seton HR in response to her report of patient care issues.

37. The next day, April 26, 2011, Dulfer met with Humphrey, where Humphrey notified Dulfer that she was being placed on suspension without pay due to four specific allegations being raised for the first time against Dulfer regarding incidents all of which allegedly occurred between five and two weeks prior.

38. In fact these allegations were not mentioned to Dulfer prior to her report of continued harassment and the resulting patient care issues on April 22, 2011.

39. Humphrey informed Dulfer that she would be getting back to Dulfer regarding these allegations two days later, on April 28, 2011.

40. Dulfer reported this action by Humphrey to Seton HR as it appeared to be clearly in retaliation for her reports of patient care issues, which were going unaddressed by Humphrey.

41. April 28, 2011 came and went with no contact or attempted contact from Humphrey or any other Seton representative.

42. Dulfer received a call from Seton HR on May 3, 2011 and learned that this HR representative, Elena Rojo, had spoken to unspecified ED staff who Rojo reported all denied having witnessed or experienced any hostility in the ED and that without exception, these same employees described Dulfer as a defensive and angry person.

43. Rojo also denied that she found any evidence of retaliation as alleged by Dulfer.

44. Rojo concluded the telephone call with a statement that Dulfer would need to wait to hear back from Humphrey and that Dulfer should consider whether the ED was to right place for her.

45. By May 6, 2011, Dulfer had still not heard back from Humphrey and what was supposed to be a two-day unpaid suspension had now become two weeks without pay with no indication of whether or when Dulfer would ever be able to work again.

46. At that point Dulfer considered that she had been constructively discharged and therefore emailed Humphrey her involuntary resignation.

47. In addition to her being placed on unpaid suspension and constructively discharged by Seton, Dulfer became aware of the following other retaliatory actions against her, all of which were taken after her reports of patient care issues in the ED and all of which have resulted in past, current, and continuing economic and emotional harm:

- Falsely and publicly stating that Dulfer was terminated,
- Delaying/Denying to Dulfer payment of PTO, worked hours owed, and travel expenses owed,
- Complaint to the Board of Nursing for the issues that Dulfer had not been counseled for, for which Dulfer had not been given an opportunity to respond, and which had allegedly occurred more than a month before Dulfer's report of patient care issues,
- False and highly negative employment references in violation of Seton HR policy, and
- Stating that Dulfer is ineligible for rehire during employment references among other communications all in violation of Seton HR Policy.

48. Dulfer has suffered and continues to suffer mental anguish as a result of Seton's actions and lack of action against Dulfer.

49. Dulfer has suffered and continues to suffer difficulty in obtaining replacement employment of a comparable nature that has resulted in economic damages to her through a loss of pay, increased expenses, and a loss of and/or alteration of benefits.

50. Dulfer was unable to find a job in Texas and finally located a contract nursing position in Tennessee where she is currently working and plans to remain.

51. Dulfer has no intention or plans to return to live in Texas.

52. Many of the retaliatory actions taken by Seton against Dulfer occurred within 60 days of her report of patient care issues in the ED that was made on April 22, 2011 as described above.

53. There may be some of the false and/or negative references provided by Humphrey against Dulfer that occurred more recently and therefore outside the 60-day period.

## DAMAGES

54. As a result of Seton's and its representative's illegal acts, Dulfer has suffered loss of income, loss of retirement benefits, loss of career opportunities, loss of career investment, loss of reputation and loss of advancement. Further, Dulfer has suffered humiliation, loss of standing in the community, emotional pain and suffering, inconvenience, loss of enjoyment of life, irritation and mental anguish. Dulfer seeks actual, compensatory, statutory, exemplary, and equitable damages as well as reasonable attorney's fees and court costs and pre and post judgment interest in the maximum amounts allowed by law against Seton.

55. Dulfer asserts that these damages when combined exceed $500,000.00.

## RELIEF REQUESTED

Paragraphs one (1) through fifty-six (56) of this complaint are incorporated by reference and made a part of Relief One through Relief Four, inclusive.

## LEGAL RELIEF

### Relief One

Dulfer seeks payment of her actual damages, which includes back pay, front pay, emotional distress/pain and suffering, inconvenience, humiliation, loss of enjoyment of life, irritation, loss of career advancement, moving expenses, loss of employment benefits, and increased costs.

### Relief Two

Due to the willful conduct and/or reckless disregard with which Seton engaged in the retaliatory actions against Dulfer due to her reports of patient care issues, Dulfer seeks payment of exemplary damages.

### Relief Three

Dulfer is entitled to and seeks reasonable attorney's fees and court costs.

### Relief Four

Dulfer seeks awards of pre- and post-judgment interest on any amounts awarded to her.

### PRAYER FOR RELIEF

Plaintiff request the Court to cause Seton to be cited to appear and answer in this Court, and that upon final hearing, the Court grant to Plaintiff as follows:

1. Grant Plaintiff her actual damages;

2. Grant Plaintiff exemplary damages;

3. Grant Plaintiff her reasonable attorney's fees, together with her court costs;

4. Grant Plaintiff pre & post-judgment interest in the highest lawful amount; and

5. Such other and further relief as the Court determines justice and equity so require.

Respectfully submitted,

/s/ Robert Notzon
Robert Notzon
The Law Office of Robert Notzon
Texas Bar No. 00797934
1507 Nueces Street
Austin, Texas 78701
(512) 474-7563
(512) 474-9489 facsimile
ATTORNEY FOR PLAINTIFF